# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Cheryl J., | Case No. 18-cv-1292 (TNL) |
| Plaintiff, | |
| v. | **ORDER** |
| Andrew Saul,<br>Commissioner of Social Security,[1] | |
| Defendant. | |

Edward C. Olson, 331 Second Avenue South, Suite 420, Minneapolis, MN 55401; and Karl E. Osterhout, Osterhout Disability Law, LLC, 521 Cedar Way, Suite 200, Oakmont, PA, 15139 (for Plaintiff); and

Kizuwanda Curtis, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite A702, Dallas, TX, 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff Cheryl J. brings the present case, contesting Defendant Commissioner of Social Security's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. *Andrew Saul*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner html (last visited Sept. 4, 2019). The Court has substituted Commissioner Saul for Nancy A. Berryhill. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

This matter is before the Court on the parties' cross-motions for summary judgment. (ECF Nos. 12, 15.) For the reasons set forth below, Plaintiff's motion is granted in part and denied in part; the Commissioner's motion is granted in part and denied in part; and this matter is remanded to the Social Security Administration for further proceedings consistent with this opinion.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in February 2015, asserting that she is disabled due to, among other things, posttraumatic stress disorder, depression, and anxiety.[2] (Tr. 21, 84, 96, 99, 112.) Plaintiff's DIB application was denied initially and again upon reconsideration. (Tr. 21, 94, 96, 111, 112.) Plaintiff appealed the reconsideration of her DIB determination by requesting a hearing before an administrative law judge ("ALJ"). (Tr. 21; *see* Tr. 117-18, 164-65.)

The ALJ held a hearing in June 2017. (Tr. 21, 61-83.) After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied her request for review. (Tr. 1-14, 21-33.) Plaintiff then filed the instant action, challenging the ALJ's decision. (Compl., ECF No. 1.) The parties have filed cross motions for summary judgment. (ECF Nos. 12, 15.) This matter is now fully briefed and ready for a determination on the papers.

---

[2] Plaintiff also asserted disability based on physical impairments not at issue here. (Tr. 84, 99.)

### III. BACKGROUND

Plaintiff has a history of posttraumatic stress disorder, generalized anxiety disorder, and depression.[3] (*See, e.g.*, Tr. 367, 365, 363, 361, 359, 357, 355, 353, 349, 347, 345, 343, 340, 419, 417, 415, 514, 512, 510, 508, 506, 504, 500, 498, 496, 494, 492, 490, 488.)

#### A. Mental-Health Treatment

Plaintiff has been seeing Deb Orman, APRN,[4] since at least March 2014 for mental-health treatment. (Tr. 368.) Up until approximately April 2016, Orman's work was supervised by Craig J. Vine, MD. (Tr. 368, 366, 364, 360, 358, 356, 354, 352, 350, 348, 343, 343, 341, 338, 422, 420, 418, 416, 517, 515, 513, 511, 509, 507, 505, 503.)

#### 1. 2014

In 2014, Plaintiff saw Orman approximately once per month. (Tr. 367, 365, 363, 361, 359, 357, 355, 353, 351, 349, 347, 345.) During her sessions, Plaintiff reported feeling depressed, anxious, hopeless, irritable, and tired. (Tr. 367, 363, 361, 359, 355, 353, 347.) Plaintiff would be "one minute up then bott[o]m to depression and full of anxiety." (Tr. 359; *see* Tr. 357, 349.) Plaintiff reported difficulty interacting with others and connecting to people. (Tr. 367; *see* Tr. 365.)

During their sessions, Orman observed that Plaintiff was generally well-groomed, and made good eye contact. (Tr. 367, 365, 361, 359, 357, 355, 353, 351, 349, 347. *But see* Tr. 363, 355.) Plaintiff's attention and concentration were also generally within normal

---

[3] The parties do not dispute that these conditions were often referred to by certain diagnostic codes.
[4] Orman's title is described differently throughout the record. (*See, e.g.*, Tr. 368 ("RN NS, CNS"), 378 ("APRN"), 387 ("RN, MS, CNS, MPH"), 489 ("RN MS, CNS, APRN").) The parties and the ALJ refer to Orman as an advanced practice registered nurse, and the Court does so here.

limits; her thought processes linear and logical; and her insight and judgement intact. (Tr. 367, 365, 363, 361, 359, 357, 355, 353, 351, 349, 347. *But see* Tr. 359.)

Plaintiff's mood varied. At times, Orman observed that she was depressed. (Tr. 367, 363, 359, 355, 353.) Other times, Plaintiff showed improvement and was within normal limits. (Tr. 365, 361, 351, 349, 347.) Plaintiff's affect also varied. Plaintiff's affect was described as being irritable, anxious, depressed, dysphoric, and flat as well as euthymic and less flat. (Tr. 367, 365, 363, 361, 359, 357, 355, 353, 349, 347.) Plaintiff experienced suicidal thoughts from time to time. (*Compare* Tr. 365, 359, 355, 347 *with* Tr. 367, 365, 361, 357, 353, 351, 349.) Orman routinely assigned Plaintiff a GAF score of 55, but also assigned lower scores, 48 and 50, on two occasions.[5] (*Compare* Tr. 367, 365, 361, 360, 358, 355, 353, 349, 347 *with* Tr. 364, 355.)

---

[5] "The GAF scale measures 'psychological, social, and occupational functioning on a 1 to 100 scale.'" *Wright v. Colvin*, 789 F.3d 847, 854 n.4 (8th Cir. 2015) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994)). "A GAF of 41 to 50 indicates the individual has serious symptoms or any serious impairment in social, occupational, or social functioning." *Martise v. Astrue*, 641 F.3d 909, 917 n.5 (8th Cir. 2011) (quotation omitted). "A GAF of 51 to 60 indicates the individual has moderate symptoms or moderate difficulty in social, occupational, or school functioning." *Pate-Fires v. Astrue*, 564 F.3d 935, 938 n.3 (8th Cir. 2009) (quotation omitted). "In recent years, the [Social Security Administration] has recognized, and [the Eighth Circuit Court of Appeals] ha[s] noted, that GAF scores have limited importance." *Nowling v. Colvin*, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016).

During this time, Orman prescribed a number of different medications, including Latuda,[6] Klonopin,[7] Paxil,[8] Sonata,[9] Tegretol XR,[10] lithium carbonate,[11] and Zyprexa.[12] (Tr. 368, 366, 364, 362, 360, 358, 356, 354, 352, 351, 350.) Plaintiff most often took Latuda and Klonopin combined with other medications. Plaintiff experienced some improvement with her medication. (Tr. 365, 363, 361, 359, 357, 353, 351; *see* Tr. 349.) And, while some of these medications helped with some of Plaintiff's symptoms, they also at times caused increases in other symptoms, such as difficulty sleeping, increased depression, and anger. (*See, e.g.*, Tr. 359, 355.)

### 2. 2015

#### a. Treatment with Orman

Plaintiff continued seeing Orman throughout 2015. During the first half of 2015, she saw Orman more often, about twice per month. (Tr. 345, 342, 340, 337, 421, 419, 417.) Towards the second half, Plaintiff saw Orman once per month. (Tr. 414, 516, 514,

---

[6] Latuda is a brand name for lurasidone, a medication used to treat depression among other conditions. *Lurasidone*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a611016 html (last visited Sept. 4, 2019).

[7] Klonopin is a brand name for clonazepam and "used to relieve panic attacks." *Clonazepam*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682279 html (last visited Sept. 4, 2019).

[8] Paxil is a brand name for paroxetine, a medication used to treat a number of conditions including but not limited to depression, panic disorder, generalized anxiety disorder, and posttraumatic stress disorder. *Paroxetine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a698032 html (last visited Sept. 4, 2019).

[9] Sonata is a brand name for zaleplon and used to treat insomnia. *Zaleplon*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a601251.html (last visited Sept. 4, 2019).

[10] Tegretol is a brand name for carbamazepine, which can be used to treat individuals experiencing episodes of mania and bipolar disorder. *Carbamazepine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682237.html (last visited Sept. 4, 2019).

[11] Lithium can be used to treat episodes of mania associated with bipolar disorder as well as depression. *Carbamazepine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682237.html (last visited Sept. 4, 2019).

[12] Zyprexa is a brand name for olanzapine, a medication used to treat bipolar disorder among other conditions. *Olanzapine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a601213 html (last visited Sept. 4, 2019).

512, 510, 508.) Plaintiff continued struggling with depression and anxiety. (Tr. 342, 341, 340, 337, 414, 417, 516, 514, 510, 508; *see* Tr. 512.) Plaintiff also had trouble with ruminating thoughts. (*Compare* Tr. 342, 340 *with* Tr. 516, 514; *see* Tr. 414.)

Additionally, Plaintiff reported difficulties concentrating. (Tr. 342, 337, 421.) Plaintiff would "sit[] at [her] desk confused and [was] unable to sort out what she has to do next." (Tr. 342.) Plaintiff also had "a hard time staying focused on things" and could "only do things for short periods." (Tr. 337.) Plaintiff had little motivation to do things. (Tr. 337.) Plaintiff moved between a recliner and her bed and was "unable to do her crafts." (Tr. 417; *see* Tr. 414.) In April, Orman noted that Plaintiff "remains unable to work due to severe depression and anxiety," is "[u]nable to concentrate, [and] minimally functions in the day." (Tr. 338.) In or around the end of June, Plaintiff moved in with her mother. (Tr. 414; *see* Tr. 516.)

The findings of Plaintiff's mental-status examinations were largely the same. She continued to present generally as well groomed with good eye contact. (Tr. 345, 342, 340, 337, 421, 419, 417, 414, 516, 514, 512, 510, 508. *But see* Tr. 342, 340, 337, 508.) Her attention and concentration likewise generally continued to be within normal limits; her thinking was most often linear and logical; and her judgment and insight were intact. (Tr. 345, 342, 340, 337, 421, 419, 417, 414, 415, 516, 514, 512, 510, 508. *But see* Tr. 337, 510.)

While Plaintiff's mood was at times within normal limits, it was most often depressed. (*Compare* Tr. 345, 419, 417, 414, 510 *with* Tr. 342, 340, 337, 516, 514, 512, 508.) Similarly, while Plaintiff's affect was occasionally euthymic, it was most often

blunted and at times anxious and flat. (*Compare* Tr. 345, 419, 417 *with* Tr. 340, 414, 516, 514, 512, 510, 508 *with* Tr. 342, 340, 337, 421.) Plaintiff also continued to experience suicidal thoughts. (Tr. 342, 340, 508; *see* Tr. 337, 414, 514.) During this time, Orman most commonly assessed Plaintiff as having a GAF score of 48, with one score of 55 and one score of 40. (Tr. 345, 343, 340, 338, 420, 417, 415, 516, 515, 513.)

Orman continued to prescribe Klonopin and Zyprexa. (Tr. 346, 343, 341, 338, 422, 420, 418, 415, 517, 515, 513, 511, 509.) At times, Plaintiff tried Latuda and Paxil as well. (Tr. 346, 343, 341, 338, 422.) Plaintiff also tried Wellbutrin (Tr. 515),[13] Valium (Tr. 511),[14] and Rexulti (Tr. 509).[15]

### b.  ASD

### i.  Pre-Assessment

In March, Orman noted that Plaintiff "is very concrete, does not get jokes, has a rough time [with] reciprocity, [and] has a great deal of social difficulty." (Tr. 340.) Orman discussed autism spectrum disorder ("ASD") with Plaintiff and referred her to the Autism Society of Minnesota for further evaluation. (Tr. 341; *see* Tr. 338.) During her appointment at the end of April, Plaintiff reported that she had been diagnosed "with being on the spectrum." (Tr. 421.) While awaiting the results of the evaluation, Orman noted "rule out ASD" in Plaintiff's diagnoses. (*See* Tr. 340, 337, 419, 417, 415.)

---

[13] Wellbutrin is a brand name for bupropion and used to treat depression. *Bupropion*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a695033 html (last visited Sept. 4, 2019).
[14] Valium is a brand name for diazepam and "used to relieve anxiety." *Diazepam*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682047.html (last visited Sept. 4, 2019).
[15] Rexulti is a brand name for brexpiprazole and can be "used with an antidepressant to treat depression when symptoms cannot be controlled by the antidepressant alone." *Brexpiprazole*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a615046.html (last visited Sept. 4, 2019).

### ii. Assessment

For three days in and around the middle of April, Plaintiff met with Tamara Phillips, MA, LMFT, with the Autism Society of Minnesota for an assessment. (Tr. 381-91.) Plaintiff reported a history of depression and anxiety with an increase in symptoms. (Tr. 381.) Plaintiff reported that she used to enjoy cross-stich, crochet, and bead work, but now spends most of her day watching television. (Tr. 381; *see* Tr. 385, 387.)

Plaintiff reported that she had no social relationships and "a few acquaintances." (Tr. 381; *see* Tr. 387.) She had "[d]ifficulty making and keeping friends." (Tr. 385.) When asked about how she responds to a person who is emotional, Plaintiff stated that she does not know what to say after asking what is wrong. (Tr. 383; *see* Tr. 388.) Plaintiff reported that she "sometimes has difficulty understanding humor," and is "[o]ften told she is wrong relating to people's emotions." (Tr. 383; *see* Tr. 388.) Plaintiff also reported "[d]ifficulty reading body language . . . ." (Tr. 383.) Similarly, Plaintiff had "[d]ifficulty reading between the lines, [and] prefer[red] people to be direct with her." (Tr. 383; *see* Tr. 388.) Plaintiff also "[d]islike[d] small talk," stating that she "doesn't know what to talk about and needs the other person to lead the conversation." (Tr. 383; *see* Tr. 388.) Plaintiff reported that she "[c]an relate well to her cats" and "[s]peaks the same to children and pets as she does adults." (Tr. 385.)

Plaintiff also reported that she "[b]ecomes agitated and anxious" in the face of "unexpected changes." (Tr. 385; *see* Tr. 388.) Plaintiff believed she was capable of multi-tasking, but got "frustrated when she [wa]s interrupted." (Tr. 385.) Plaintiff "[l]ike[d] rules to help her function." (Tr. 385.)

During these sessions, Phillips observed that Plaintiff's mood was anhedonic and depressed, and her affect was flat. (Tr. 382, 383, 385; *see* Tr. 387.) Plaintiff's thoughts were oriented. (Tr. 382, 383, 385.) Phillips assessed Plaintiff with a GAF score of 50. (Tr. 382, 384, 386.)

Phillips diagnosed Plaintiff with ASD along with depression, generalized anxiety disorder, and posttraumatic stress disorder. (Tr. 391.) Phillips's diagnosis was cosigned by Barbara Lushkin, PhD, LP. (Tr. 391.) Phillips's assessment was based in part on the Ritvo Autism Asperger Diagnostic Scale-Revised (RAADS-R). "Individuals need to score [greater than] 65 to receive an ASD diagnosis," and Plaintiff "obtained a score of 146." (Tr. 389.)

Among other things, Phillips stated that Plaintiff "has difficulty with back-and-forth conversation, understanding facial expressions, eye contact and non-verbal communication." (Tr. 389.) Plaintiff's "own emotional expressions are limited and she has restricted use of social smiling." (Tr. 389.) "While [Plaintiff] intermittently enjoys being around others, her relationships lack reciprocity," and "[s]he has difficulty adjusting her behavior to suit various social contexts." (Tr. 389.) Plaintiff also "understands language very literally." (Tr. 390.)

Phillips also stated that Plaintiff "struggles with change in routine," and "[h]as historically had difficulty with transitions, rigid patterns of thinking and greeting rituals." (Tr. 390.) Plaintiff also "becomes overwhelmed in loud environments or when she is with a large number of people." (Tr. 390.) Plaintiff also "engage[d] in repetitive behaviors including rocking back and forth." (Tr. 390.)

9

Phillips additionally stated that "[a]nother common characteristic of ASD is a language processing delay." (Tr. 390.) Phillips noted that Plaintiff's processing of information may be delayed when she is under stress. (Tr. 390.) "[Plaintiff] may often need additional time (10 to 15 seconds) to process the information and respond, may ask for the information to be repeated, and may need additional clarification." (Tr. 390.) Phillips further noted that "[i]t may be beneficial for [Plaintiff] to have information written down for her to read[] instead of given verbally." (Tr. 390.)

On a three-point scale where "1" indicated "requiring support" and "3" indicated "requiring very substantial support," Phillips rated Plaintiff a "1" in both "[s]ocial communication" and "[r]estricted, repetitive behaviors." (Tr. 391.)

### iii.    Post-Assessment

Beginning in July and continuing thereafter, Orman included ASD among Plaintiff's diagnoses.[16] (Tr. 516, 514, 512, 510, 508; *see also* Tr. 506, 504, 500, 498, 496, 494, 492, 490, 488.)

### 3.  2016

Plaintiff met with Orman approximately once per month in 2016. (Tr. 506, 504, 502, 500, 498, 496, 494, 492, 490.) Her depression and anxiety continued to fluctuate. (*See, e.g.*, Tr. 506, 504, 502, 500, 496.) In February, Plaintiff reported being "frozen with fear al[l] the time," and "unable to stop the constant worrying." (Tr. 504.) Plaintiff "fe[lt]

---

[16] *See supra* n.3.

like her gut is churning all the time." (Tr. 504.) Plaintiff also reported being "a little shaky when she signs her name," which she attributed to "anxiety." (Tr. 504.)

Plaintiff also continued to struggle with a lack of motivation. (*See, e.g.*, Tr. 506, 502, 498, 494, 492, 490.) Plaintiff reported that she just sits around. (Tr. 506; *see* Tr. 502.) Plaintiff also reported that "nothing is enjoyable anymore" and she was not interested in doing crafts. (Tr. 502.) In June, however, Plaintiff reported that "[s]he was able to bead the other day and had not done this in a long[]time." (Tr. 498.)

Plaintiff's mental status examinations remained largely unchanged. She was generally well groomed and made good eye contact. (Tr. 506, 504, 502, 498, 496, 494, 492, 490. *But see* Tr. 506, 504, 502, 500.) Her attention and concentration continued to generally be within normal limits; her thought processes linear and logical; and her judgment intact. (Tr. 506, 504, 502, 500, 498, 496, 494, 492, 490. *But see* Tr. 494, 490.) Plaintiff's mood remained depressed and her affect was most often flat or blunted. (Tr. 506, 504, 502, 500, 496, 494, 492, 490. *But see* Tr. 498, 494, 490.) Plaintiff also continued to have suicidal thoughts on occasion. (Tr. 504; *see* Tr. 502, 500, 498, 496, 490.)

Plaintiff's medication regimen remained centered around Klonopin and Zyprexa. (Tr. 507, 505, 503, 501, 499, 497, 495, 493, 491.) Occasionally, Orman recommended Plaintiff try adding in other medications, such as hydroxyzine hydrochloride[17] and Paxil. (Tr. 505, 501, 499, 497.)

---

[17] Hydroxyzine is "used alone or with other medications in adults and children to relieve anxiety and tension." *Hydroxyzine*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682866.html (last visited Sept. 4, 2019).

### 4. 2017

Plaintiff saw Orman once at the end of March 2017. (Tr. 488.) Plaintiff told Orman that "[s]he does not feel like she can hold down a job." (Tr. 488.) Plaintiff's "depression remain[ed] quite strong" and her "anxiety remain[ed] the same." (Tr. 488.) Plaintiff would "have a day [where] she lightens up and [the] next day she is back." (Tr. 488.) Plaintiff's mental status examination was consistent with prior appointments, including a depressed mood and blunted affect. (Tr. 488.) Orman prescribed Lexapro[18] in addition to Klonopin and Zyprexa. (Tr. 489.)

### 5. Treatment with Gassner

Plaintiff has been receiving dialectical behavior therapy from Megan Gassner, MA, LMFT, since October 2013.[19] (Tr. 371, 381.) Plaintiff continued working with Gassner individually when she was no longer able to afford attending group sessions. (Tr. 345; *see* Tr. 353, 355, 357, 338, 512.) As of March 2017, Plaintiff saw Gassner approximately once per month, but may have seen her on a more frequent basis in the past. (Tr. 488; *see* Tr. 381.) There are no treatment notes from Gassner in the record, only treatment notes from other providers indicating that Plaintiff was seeing Gassner.

---

[18] Lexapro is a brand name for escitalopram and used to treat depression and anxiety. *Escitalopram*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a603005.html (last visited Sept. 5, 2019).
[19] While the record is less clear with respect to Gassner, the Commissioner is incorrect that she is "only reference[d]" in Phillips's assessment. (Comm'r's Mem. in Supp. at 17 n.9, ECF No. 16; *see, e.g.*, Tr. 345, 488, 512.)

### III. OPINION EVIDENCE

#### A.  Gassner/Orman Medical Source Statement

In April 2015, Gassner completed a medical source statement ("MSS").  (Tr. 371-78.)  The MSS was cosigned by Orman.  (Tr. 378.)  Gassner listed Plaintiff's diagnoses as depression, posttraumatic stress disorder, and generalized anxiety disorder.  (Tr. 371.)  Gassner described Plaintiff's prognosis as "poor," stating that Plaintiff had experienced "limited improvement" with dialectical behavior therapy and had "tried alternative treatments previously with limited-poor results."  (Tr. 371.)  Gassner assessed Plaintiff with a GAF score of 45.  (Tr. 371.)

Most of the MSS was in a checklist-type format.  Gassner checked off that Plaintiff experienced memory impairment, "[p]erceptual or thinking disturbances," mood disturbances, and "[e]motional lability and impairment in impulse control."  (Tr. 371.)  Gassner checked off multiple symptoms experienced by Plaintiff related to depressive disorders. (Tr. 372.)  Gassner also checked off multiple symptoms experienced by Plaintiff related to anxiety disorders. (Tr. 372.)  In addition, Gassner checked off several symptoms experienced by Plaintiff related to personality disorders.  (Tr. 374.)

Gassner indicated that Plaintiff could not tolerate more than "low" stress in an employment setting based on her conditions, and that Plaintiff's "symptoms w[ould] interfere with [her] ability to retain employment."  (Tr. 374.)  Gassner checked "yes" when asked if Plaintiff's symptoms would increase if she returned to work, and that a "marked" increase would be expected.  (Tr. 375.)  Gassner indicated that Plaintiff's symptoms markedly impaired her ability to perform activities of daily living, and extremely limited

13

her ability to maintain social functioning, concentration, persistence, and pace. (Tr. 375.) Gassner reported that Plaintiff had experienced at least three episodes of decompensation in a single year. (Tr. 375.) Gassner checked "yes" when asked if "even a minimal increase in mental demands or change [would] be predicted to cause [Plaintiff] to decompensate." (Tr. 376.) Gassner estimated that Plaintiff was likely to miss work twice per month "due to psychologically based symptoms." (Tr. 377.)

Next, Gassner responded to a number of questions regarding Plaintiff's capability for certain activities. Gassner checked "good," meaning that Plaintiff could perform the activity "satisfactorily for *most* of the time," with regards to her ability to "understand, remember and carry out simple job instructions" and "sustain an ordinary routine without special supervision." (Tr. 376-77 (emphasis added).)

Gassner checked "fair," meaning that Plaintiff could perform the activity "satisfactorily *some* of the time" for four activities. (Tr. 376-77 (emphasis added).) These were "maintain[ing] attention and concentration for a two[-]hour segment"; "work[ing] with or near others without being distracted by them"; "perform[ing] activities within a schedule, be[ing] punctual and adher[ing] to basic work-place standards"; and "maintain[ing] socially appropriate behavior." (Tr. 377.)

For the remaining activities, Gassner checked "poor," meaning that Plaintiff had "[n]o useful ability to [perform that] function." (Tr. 376.) These activities included understanding, remembering, and carrying out detailed and complex instructions; dealing with coworkers, supervisors, and the public; tolerating routine supervision, including instructions and criticism; handling changes in a routine work setting; "mak[ing] basic

14

decisions and exercis[ing] proper judgment in a work setting"; and "complet[ing] a normal workday or work week without interruptions from psychologically based symptoms." (Tr. 376-77.)

## B. State Agency Psychologists

As part of the initial determination and on reconsideration, state agency psychologists performed a psychiatric review technique and mental residual functional capacity assessment. (Tr. 89-92, 105-09.) As part of the psychiatric review technique, Plaintiff's conditions were considered under listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.10 (autistic disorder). (Tr. 89, 105.) Plaintiff was determined to have medically determinable impairments that did not satisfy the listing criteria. (Tr. 89-90, 105.)

In relevant part, James M. Alsdurf, PhD, LP, noted during the initial determination that Plaintiff "appears to meet criteria for Autism with limited functional information referenced." (Tr. 89.) Alsdurf noted that the MSS was "offered by a non-programmatic source (LMFT) and is seen as partially credible." (Tr. 89.) Alsdurf further noted that Plaintiff "can drive, prepare meals, do a range of household tasks, shop, be outside daily, manage her finances, attend AA twice a week, talk to her family, and go out to eat with her son. Plaintiff also watches TV, does cross[-]stitching, and bead work." (Tr. 89-90.)

Alsdurf opined that Plaintiff has no understanding and memory limitations, and "retains the capacity to concentrate on, understand, and remember routine, repetitive tasks, and three and four step, uncomplicated instructions, but would have moderate problems with detailed, and marked problems with complex, instructions." (Tr. 92; *see* Tr. 91.)

Alsdurf further opined that "[Plaintiff's] ability to carry out tasks with adequate persistence and pace would be moderately impaired, but adequate for routine, repetitive tasks, but not for detailed or complex tasks." (Tr. 92; *see* Tr. 91.) Alsdurf similarly opined that "[Plaintiff's] ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive and a three and four step work setting." (Tr. 92; *see* Tr. 91.)

Alsdurf opined that "[Plaintiff's] ability to interact and get along with co-workers would be moderately impaired, but adequate for brief and superficial contact." (Tr. 92; *see* Tr. 91-92.) Alsdurf likewise opined that "[Plaintiff's] ability to interact with the public would be moderately impaired, but adequate for brief and superficial contact." (Tr. 92; *see* Tr. 91-92.) And, Alsdurf opined that "[Plaintiff's] ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customary work settings." (Tr. 92; *see* Tr. 91-92.)

On reconsideration, Ray M. Conroe, PhD, LP, concurred with Alsdurf's opinions. (*Compare* Tr. 89-92 *with* Tr. 105-109.)

## IV. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Id.* This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Id.* The ALJ's decision "will not [be] reverse[d] simply because some evidence

supports a conclusion other than that reached by the ALJ." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); *accord* 20 C.F.R. § 404.315 (2014).[20] An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was

---

[20] All references herein are to the 2014 regulations.

> comparable to, a listed impairment; (4) she could perform past
> relevant work; and if not, (5) whether she could perform any
> other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).  In general, the burden of proving

the existence of disability lies with the claimant.  20 C.F.R. § 404.1512(a).  Plaintiff

challenges the ALJ's determinations at steps two and four.  *See Cuthrell v. Astrue*, 702

F.3d 1114, 1116 (8th Cir. 2013) ("[S]tep two determines whether the claimant has a

'severe' medically determinable impairment (or combination of impairments)."); *Goff v.

Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("The fourth step in this analysis requires the

ALJ to determine a claimant's [residual functional capacity]." (quotation omitted)).

## A. ASD as Medically Determinable Impairment

Plaintiff first argues that the ALJ erred by not finding that her ASD was a medically

determinable impairment.  A medically determinable impairment "is an impairment that

results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42

U.S.C. § 423(d)(3); *accord* 20 C.F.R. § 404.1508.  "A physical or mental impairment must

be established by medical evidence . . . ."  20 C.F.R. § 404.1508.  Under the regulations in

effect at the time of Plaintiff's application, evidence establishing a medically determinable

impairment must come from an acceptable medical source.  20 C.F.R. § 404.1513(a); *Sloan*

*v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) ("Only acceptable medical sources can provide

evidence to establish the existence of a medically determinable impairment . . . ."); *see*

*Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not*

*"Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability*

*by Other Governmental and Nongovernmental Agencies*, SSR 06-03p, 2006 WL 2329939, at *2 (Soc. Sec. Admin. Aug. 9, 2006) ("[W]e need evidence from 'acceptable medical sources' to establish the existence of a medically determinable impairment.").[21]  At the time of Plaintiff's application, "acceptable medical sources" included licensed physicians and licensed or certified psychologists, among others.  20 C.F.R. § 404.1513(a)(1), (2).

The ALJ found and concluded that Plaintiff had the medically determinable impairments of posttraumatic stress disorder, depression, and generalized anxiety disorder, and these impairments were severe.  (Tr. 23.)  With respect to ASD, the ALJ acknowledged that Phillips had diagnosed Plaintiff with ASD.  (Tr. 24.)  The ALJ stated, however, that "Ms. Phillips is a licensed marriage and family therapist and there is no evidence in the file [Plaintiff] has been treated or diagnosed by a physician, psychologist, or psychiatrist for her [ASD]."  (Tr. 24.)  The ALJ found that Plaintiff's ASD "[wa]s a non-medically determinable impairment since no acceptable medical source ha[d] treated or diagnosed [Plaintiff] for this condition."  (Tr. 24.)

Plaintiff argues that the ALJ failed to acknowledge that Lushkin, a licensed psychologist, participated in Plaintiff's ASD diagnosis.  Based on the fact that Lushkin cosigned the diagnoses prepared by Phillips, Plaintiff argues "she was evaluated and diagnosed with ASD" by an acceptable medical source.  (Pl.'s Mem. in Supp. at 5, ECF No. 13.)  Plaintiff also argues that the ALJ failed to acknowledge that Orman and Dr. Vine

---

[21] SSR 06-03p was rescinded on March 27, 2017.  Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15,263, 15, 263 (Mar. 27, 2017).  The rescission was "effective for claims filed on or after March 27, 2017."  *Id.*  As stated above, Plaintiff filed for DIB in 2015.

"diagnosed and treated Plaintiff with [ASD] following her evaluation from July 2015 through at least March 2017."  (Pl.'s Mem. in Supp. at 7.)

The Court finds there is substantial evidence to support the ALJ's conclusion that Plaintiff's ASD was not diagnosed by an acceptable medical source.  Phillips is a licensed marriage and family therapist.  "A therapist is not an 'acceptable medical source' to establish 'a medically determinable impairment.'"  *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005); *see Lacroix v. Barnhart*, 465 F.3d 881, 886 (8th Cir. 2006).  Each session of the assessment was conducted by Phillips.  The diagnostic summary itself states: "*This Licensed Marriage and Family Therapist* met with [Plaintiff] for observations and assessment on 04/13/15 and 04/16/2015 and 04/23/2015."  (Tr. 387 (emphasis added).)  The diagnostic summary further states: "*This therapist* assessed [Plaintiff] through questionnaire, interview, observation and the [RAADS-R]."  (Tr. 387 (emphasis added).)  Plaintiff has pointed to no evidence in the record that Lushkin participated in the assessment or diagnosis, relying instead on inference and speculation based on Lushkin's signature at the end of the diagnostic summary.

Nor has Plaintiff cited to any authority that the signature of an acceptable medical source on a diagnostic summary prepared by and following an assessment conducted by someone who is not an acceptable medical source is equivalent to an evaluation and a diagnosis by the acceptable medical source herself.  *Cf. Dick v. Comm'r of Soc. Sec.*, No. 4:13 CV 524, 2014 WL 1270594, at *6 (N.D. Ohio Mar. 26, 2014) (no treating relationship with doctor who signed off on two assessments by therapist where "there is no evidence [the doctor] was present at any examinations related to the assessments, nor does the record

indicate [the doctor] ever treated Plaintiff, let alone had an ongoing treatment relationship with her"); *Rabideau v. Comm'r of Soc. Sec.*, No. 1:12-CV-108, 2013 WL 5354215, at *1 (W.D. Mich. Sept. 24, 2013) (no error attributing two opinions signed by physician's assistant to physician's assistant rather than doctor whose stamp appeared on opinions).

The same is true with respect to Orman and Dr. Vine. Orman, an advanced practice registered nurse, is also not an acceptable medical source under the applicable regulations. Orman referred Plaintiff for assessment and included ASD among Plaintiff's diagnoses beginning in July 2015. Up until approximately April 2016, Orman's treatment notes indicated that she was supervised by Dr. Vine. Again, other than what could possibly be inferred from a notation indicating the identity of a supervisor, Plaintiff has pointed to no evidence in the record that Dr. Vine participated in her treatment and diagnosis. And, like Lushkin, Plaintiff has not cited to any authority that this type of notation on notes regarding treatment conducted by someone who is not an acceptable medical source is the equivalent of an evaluation and a diagnosis by an acceptable medical source. *Cf. Ellis v. Colvin*, No. 3:15-CV-186-HBG, 2016 WL 1295033, at *6 (E.D. Tenn. Mar. 31, 2016) ("The Court declines to find the action of 'co-signing' several of the treatment notes an indication that Dr. Foote had an 'ongoing treatment relationship' with the Plaintiff.").

In sum, the ALJ did not err in finding that there was no evidence in the record that Plaintiff had been diagnosed with or treated for ASD by an acceptable medical source. Because there was no evidence from an acceptable medical source establishing the existence of ASD, the ALJ did not err in determining that ASD was not a medically

determinable impairment.  *See, e.g.*, *Villa v. Colvin*, No. 16-cv-186 (BRT), 2017 WL 5957651, at *5 (D. Minn. Feb. 22, 2017).

### B.  Residual Functional Capacity

Plaintiff's last two assignments of error relate to the ALJ's determination of her residual functional capacity.  A claimant's "residual functional capacity is the most [she] can do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence.").  "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  *Perks*, 687 F.3d at 1092 (quotation omitted).  "Medical records, physician observations, and the claimant's subjective statements about h[er] capabilities may be used to support the [residual functional capacity]."  *Id.*  "Even though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."  *Id.* (quotation omitted); *see* 20 C.F.R. § 404.1546(c).

The ALJ determined that Plaintiff "was limited to simple routine repetitive type work limited to superficial interactions with others defined as speaking, signaling, asking questions, taking instructions and serving" with "no conflict resolution and no counseling." (Tr. 26.)  In reaching this residual-functional-capacity determination, the ALJ considered Plaintiff's daily activities; her own statements regarding the intensity, persistence, and

functional limitations of her alleged symptoms; Orman's treatment notes; the MSS; and the opinions of the state agency consultants.

As for the opinion evidence, the ALJ assigned "little weight" to the MSS and "partial weight" to the state agency psychological consultants. (Tr. 30.) The ALJ concluded that the evidence in the record did not support Plaintiff's statements regarding the intensity, persistence, and functional limitations of her alleged symptoms based on her daily activities and the variable mental status examinations. The ALJ reasoned:

> Medical evidence of record offers variable mental status examinations [sic] findings. [Plaintiff] has linear thoughts, no suicidal ideations, and intact knowledge, insight and judgment. She was fully oriented and alert. This is essentially all that is needed to perform simple, unskilled work. Evidence of record regarding [Plaintiff's] daily activities is consistent with a residual functional capacity for work. Functionally, she can drive, prepare meals, do a range of household tasks, shop, be outside daily, manage her finances, attend AA meetings twice a week, talk to her family, and go out to eat with her son.

(Tr. 30-31.) The ALJ also stated that "[n]o treating source refers to [Plaintiff] as having incapacitating or debilitating symptoms that would prevent her from returning to the workplace at a reduced level of exertions such as in the performance of work, or has otherwise described [Plaintiff] as 'totally and permanently disabled' by her impairments and complaints." (Tr. 31.)

The Court begins with Plaintiff's argument that the ALJ erred in assigning "little weight" to the MSS. The MSS was prepared by Gassner and cosigned by Orman. The ALJ treated the MSS as authored by both of them. (*See* Tr. 29-30.) As stated above, Gassner is a licensed marriage and family therapist and Orman is an advanced practice

registered nurse. Because Plaintiff's application for DIB was filed prior to March 27, 2017, neither Gassner nor Orman are acceptable medical sources under the applicable regulations. *See* 20 C.F.R. § 404.1513(a). "[O]nly 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight." SSR 06-03p, 2006 WL 2329939, at *2; *see, e.g.*, *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016) ("A treating physician's opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record."). Accordingly, Gassner and Orman are "other medical sources." *See* SSR 06-03p, 2006 WL 2329939, at *2.

"Evidence provided by 'other sources' must be considered by the ALJ . . . ." *Lawson v. Colvin*, 807 F.3d 962, 967 (8th Cir. 2015). Opinions from "other medical sources" may be used "to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. § 404.1513(d)(1); *see* SSR 06-03p, 2006 WL 2329939, at *2. The factors for evaluating the weight given to the opinions of acceptable medical sources "can be applied to opinion evidence from 'other sources.'" SSR 06-03p, 2006 WL 2329939, at *4. These factors include the length of the relationship and frequency of the encounters; the opinion's consistency with other evidence; "[t]he degree to which the source presents relevant evidence to support an opinion"; "[h]ow well the source explains the opinion"; the source's specialization; and any other factors tending to support or contradict the opinion. SSR 06-03p, 2006 WL 2329939, at *4-5; *see Chesser v. Berryhill*, 858 F.3d 1161, 1166 (8th Cir. 2017); *see also* 20 C.F.R. § 404.1527(c).

"Not every factor for weighing opinion evidence will apply in every case," and "[t]he evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case." SSR 06-03p, 2006 WL 2329939, at *5. "In determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney*, 396 F.3d at 1010; *accord Chesser*, 858 F.3d at 1166; *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006).

The ALJ gave three reasons for the "little" weight assigned to the MSS. First, the ALJ noted that neither Gassner nor Orman were acceptable medical sources and "only an acceptable medical source can provide a medical opinion." (Tr. 30.) Second, the ALJ noted that "[t]hey provided their answers on a pre-printed form," and "did not provide a narrative explanation to support their check marks." (Tr. 30.) Third, the ALJ noted that some of the opinions in the MSS were internally inconsistent:

> They said [Plaintiff] had a marked limitation in performing activities of daily living and extreme limitations in maintaining social functioning and in maintaining concentration, persistence or pace; a chronic disorder for at least two years, and she has experienced episodes of deterioration or decompensation. However, inconsistent with these statements, they said [Plaintiff] had a good ability to understand, remember and carry out simple job instructions.

(Tr. 30.)

There is no dispute that Gassner and Orman are not acceptable medical sources. An ALJ may assign less weight to opinions by "other medical sources" that are not acceptable medical sources. SSR 06-03p, 2006 WL 2329939, at *6 ("The fact that a medical opinion

is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' . . . ."); *see Lawson*, 807 F.3d at 967. Recognizing that the ALJ may permissibly take into account whether the source of the opinion is an acceptable medical source as a factor in determining the weight given to that opinion, the Court turns to the second reason proffered by the ALJ for giving the MSS "little weight": the MSS was in a checklist-type form and did not itself include evidence or explanations in support of the limitations identified.

The Eighth Circuit Court of Appeals has stated that these checklist-type opinions are "considered a source of objective medical evidence." *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) (quotation omitted); *accord Leckenby v. Astrue*, 487 F.3d 626, 628 n.3 (8th Cir. 2007). An ALJ may not reject an opinion merely because it is in a checklist-type format. *Reed*, 399 F.3d at 921. *But see Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018). It is, however, permissible for an ALJ to assign lesser weight to these types of opinions where the limitations identified "stand alone," are not mentioned in the medical records or treatment notes, or are not "supported by any objective testing or reasoning." *Reed*, 399 F.3d at 921 (quotation omitted); *accord Leckenby*, 487 F.3d at 632. In this vein, the Commissioner is correct that an opinion is entitled to less weight when it is inconsistent with treatment notes and medical evidence in the record. *See, e.g.*, *Despain v. Berryhill*, 926 F.3d 1024, 1028 (8th Cir. 2019); *Adkins v. Comm'r*, 911 F.3d 547, 549-50 (8th Cir. 2018); *Thomas*, 881 F.3d at 676; *Toland v. Colvin*, 761 F.3d 931, 935-36 (8th Cir. 2014);

*Teague v. Astrue*, 638 F.3d 611, 615-16 (8th Cir. 2011); *Johnson v. Astrue*, 628 F.3d 991, 994-95 (8th Cir. 2011); *Leckenby*, 487 F.3d at 632-33.

Despite the Commissioner's contention that the ALJ determined the MSS was inconsistent with Orman's treatment notes, the ALJ made no such determination. *See Gatewood v. Outlaw*, 560 F.3d 843, 846 (8th Cir. 2009) ("'The courts may not accept appellate counsel's *post hoc* rationalizations for agency action.'" (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *see, e.g., Powers v. Astrue*, No. 10-5018-CV-J-ODS, 2011 WL 8894, at *4 & n.4 (W.D. Mo. Jan. 3, 2011). The medical evidence in this case consisted almost entirely of Orman's treatment notes. Although the ALJ summarized Orman's treatment notes as part of the residual-functional-capacity determination, the ALJ did not articulate how the MSS was evaluated in light of those notes. Instead, the ALJ appears to have assigned reduced weight to the MSS based on the format in which the opinions were provided without addressing whether and to what extent those opinions were consistent (or inconsistent) with the underlying medical evidence.

The MSS is the only opinion evidence from medical providers that had a longitudinal relationship with Plaintiff and regularly met with her. *See* SSR 06-03p, 2006 WL 2329939, at *5; *see also* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight be will give to the source's medical opinion."). Indeed, the Social Security Administration has recognized the importance of opinions from "other medical sources" like Gassner and Orman:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p, 2006 WL 2329939, at *3; *see also Neeson v. Colvin*, No. 2:12-cv-51 (SNLJ) (SPM), 2013 WL 5442911, at *10-11 (W.D. Mo. Sept. 30, 2013). Such opinions "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939, at *2. Further, of concern to the ALJ's finding that "[n]o treating source refers to [Plaintiff] as having incapacitating or debilitating symptoms that would prevent her from returning to the workplace," Gassner and Orman opined that Plaintiff's symptoms *would* interfere with her ability to maintain employment and would markedly increase if she returned to work.

The absence of any discussion as to how the ALJ considered the MSS in light of the underlying medical evidence gives the Court further pause when viewed in conjunction with the remainder of the ALJ's residual-functional-capacity determination. The ALJ gave "partial weight" to the opinions of the state agency consultants because "they did not use words or phrases as defined by the *Dictionary of Occupational Titles* and they were vague

and imprecise," noting that "[t]hey did not quantify or explain the words" in their opinions.

(Tr. 30.) Such weight is not challenged by either party. The ALJ then ultimately reasoned:

> Medical evidence of record offers variable mental status examinations [sic] findings. [Plaintiff] has linear thoughts, no suicidal ideations, and intact knowledge, insight and judgment. She was fully oriented and alert. *This is essentially all that is needed to perform simple, unskilled work.* Evidence of record regarding [Plaintiff's] daily activities is consistent with a residual functional capacity for work. Functionally, she can drive, prepare meals, do a range of household tasks, shop, be outside daily, manage her finances, attend AA meetings twice a week, talk to her family, and go out to eat with her son.

(Tr. 30 (emphasis added).)

An ALJ may not draw her "own inferences about [the claimant's] functional ability from medical reports." *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004). Nor may the ALJ substitute her own "opinions for those of the physician." *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008); *accord Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017). "To do so constitutes unlawfully 'playing doctor.'" *Jennifer A. v. Berryhill*, No. 18-cv-459 (BRT), 2019 WL 569830, at *10 (D. Minn. Feb. 12, 2019) (quoting *Pate-Fires*, 564 F.3d at 946-47). Absent a clear indication as to how *any* of the opinion evidence—the MSS or the opinions of the state agency psychological consultants—was considered in conjunction with the medical evidence, the ALJ appears to have relied on her own inferences from Orman's treatment notes and her own opinions and conclusions as to Plaintiff's functional abilities.

The Court recognizes that the ALJ has considerably more discretion in weighing opinions from "other medical sources" compared to the opinions of acceptable medical

sources. The Court also recognizes that its role is not "to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quotation omitted). Fully credited, however, the opinions offered by Gassner and Orman in the MSS could affect the outcome of this case, particularly considering they were the only medical sources who treated or examined Plaintiff. Under the appropriate circumstances, "an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source.'" SSR 06-03p, 2006 WL 2329939, at *5.

In the end, it may very well be that the MSS is not entitled to any more than the "little weight" assigned by the ALJ. After all, it is undisputed that neither Gassner nor Orman is an acceptable medical source. *See* SSR 06-03p, 2006 WL 2329939, at *6; *see also Lawson*, 807 F.3d at 967. And, an ALJ may assign less weight to opinions that are inconsistent. *See Lacroix*, 465 F.3d at 887; *Raney*, 396 F.3d at 1010; *see also, e.g.*, *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014). It was not unreasonable for the ALJ to conclude that certain opinions in the MSS regarding the extent of Plaintiff's limitations when compared to other opinions regarding Plaintiff's abilities notwithstanding those limitations were inconsistent, such as having extreme limitations in maintaining concentration, persistence, or pace yet retaining a good ability to understand, remember, and carry out simple job instructions.

But, the absence of any clear indication as to how the ALJ considered the MSS in conjunction with the underlying medical evidence renders the ALJ's analysis incomplete. *See Neeson*, 2013 WL 5442911, at *13; *Nelson v. Astrue*, No. 11-cv-3346 (DWF/FLN),

2012 WL 7761489, at *13-14 (D. Minn. Dec. 12, 2012), *adopting report and recommendation*, 2013 WL 1104265 (D. Minn. Mar. 18, 2013); *cf. Despain*, 926 F.3d at 1028; *Leckenby*, 487 F.3d at 632-33; *Raney*, 396 F.3d at 1010. "While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency has no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand." *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (quotation omitted). The ALJ must explain the weight assigned to the MSS "sufficient for a reviewing court to determine whether the ALJ took into account the appropriate factors when considering the opinion evidence and whether the ALJ's rationale—and ultimately the residual-functional-capacity determination—is supported by substantial evidence in the record as a whole." *Marlene M. v. Berryhill*, No. 18-cv-258 (TNL), 2019 WL 1383894, at *9 (D. Minn. Mar. 27, 2019); *see* SSR 06-03p, 2006 WL 2329939, at *6 ("Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the . . . decision, the adjudicator generally should explain the weight given to opinions from the 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."). The Court is not able to do so here, and remand is required. *See* 42 U.S.C. § 405(g); *Neeson*, 2013 WL 5442911, at *13.

Because the Court vacates the ALJ's decision as to steps four and five, it does not reach Plaintiff's remaining assignment of error regarding consideration of her work history when evaluating her statements about the intensity, persistence, and functional limitations

of her alleged symptoms. The ALJ will necessarily have to reconduct the residual-functional-capacity analysis, which in turn includes reconsideration of Plaintiff's statements about the intensity, persistence, and functional limitations of her alleged symptoms.

## V. ORDER

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgement (ECF No. 12) is **GRANTED IN PART** and **DENIED IN PART**.

2. The Commissioner's Motion for Summary Judgment (ECF No. 15) is **GRANTED IN PART** and **DENIED IN PART**.

3. The Commissioner's decision is **AFFIRMED** as to steps one through three, and **VACATED** as to steps four and five.

4. This matter is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September____25____, 2019                    _____*s/ Tony N. Leung*_____
                                                    Tony N. Leung
                                                    United States Magistrate Judge
                                                    District of Minnesota


                                                    *Cheryl J. v. Saul*
                                                    Case No. 18-cv-1292 (TNL)